UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x          ECF CASE
ERNEST DAVIS, et al.,                                    :

                Plaintiffs,                    :          07 Civ. 9897 (CLB)

                             :

        - against -                              :

UNITED STATES JUSTICE
DEPARTMENT, et al.,                                  :

              Defendants.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF THE FEDERAL DEFENDANTS' MOTION TO DISMISS THE COMPLAINT


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
86 Chambers Street -- 3rd Floor
New York, New York  10007
Telephone:  (212) 637-2691
Facsimile:   (212) 637-2786


ROSS E. MORRISON
Assistant United States Attorney
     -Of Counsel-

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Democratic Party Primary and the November 8, 2007 Election for the Office of Mayor of the City of Mount Vernon, New York. . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The Search Warrant for Documents Located at Mount Vernon City Hall and the Mount Vernon Department of Public Works . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    The Instant Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT I:     SOVEREIGN IMMUNITY BARS ALL OF PLAINTIFFS' CLAIMS AGAINST THE FEDERAL DEFENDANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT II:    PLAINTIFFS LACK STANDING TO ASSERT THEIR VOTE DILUTION AND WRONGFUL SEARCH CLAIMS, AND DO NOT STATE A SELECTIVE PROSECUTION CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    Plaintiffs' Alleged Constitutional Vote Dilution Claims Should be Dismissed. . 13

        1.  Plaintiffs' Vote Dilution Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        2.  Plaintiffs Lack Standing to Maintain Their Vote Dilution Claims. . . . . . . . . . 15

    B.    Plaintiffs' Alleged Fourth Amendment Claim Should be Dismissed. . . . . . . . . 20

    C.    Plaintiffs' Alleged Selective Prosecution Claim Should be Dismissed. . . . . . . . 22

POINT III:   TO THE EXTENT PLAINTIFFS PURPORT TO SUE THE JOHN DOE FBI AGENTS IN THEIR INDIVIDUAL CAPACITIES, THE COURT SHOULD DISMISS THESE CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

POINT IV:    PLAINTIFFS' REQUEST TO FILE A SECOND AMENDED COMPLAINT
             SHOULD BE DENIED AS FUTILE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

POINT V:     THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR A
             PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29


CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

_____Defendants United States Department of Justice, Federal Bureau of Investigation ("FBI") and the United States Attorney's Office for the Southern District of New York (collectively, the "federal defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

### Preliminary Statement

In their Amended Complaint, plaintiffs, who allegedly are African-American registered voters in the city of Mount Vernon, New York, claim that the FBI's execution of a search warrant on October 12, 2007, at Mount Vernon City Hall unlawfully diluted their votes in the November 6, 2007 election for the office of the mayor of Mount Vernon, in which defendant Clinton Young ("Young") defeated plaintiff Ernest Davis ("Davis"), then the incumbent mayor. Specifically, plaintiffs claim that the federal defendants timed the FBI's search -- which was part of a lawful investigation into contracts between Mount Vernon and certain waste-hauling companies -- in order to intimidate large numbers of African-American voters in Mount Vernon from voting for Davis, an African-American, thereby causing Davis to lose the election to Young (who is also African-American), and diluting the effectiveness of the votes plaintiffs cast for Davis. Plaintiffs claim that this vote dilution violated section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and various constitutional provisions and seek six hundred million dollars in damages from the federal defendants, as well as an order requiring defendants New York and Westchester County Boards of Elections to conduct a new mayoral election. Plaintiffs' claims, which have absolutely no basis in fact, are legally meritless and should be dismissed for numerous, independent reasons.

The doctrine of sovereign immunity bars <u>all</u> of plaintiffs' claims against the federal defendants. Under that doctrine, the United States, as well as its agencies and officials

acting in their official capacities, cannot be sued without Congress' clear and unequivocal

consent.  Here, no such consent exists:   in relevant part 42 U.S.C. § 1973 only applies to a

voting "standard, practice or procedure" imposed by any "State or political subdivision" and

neither provides for a claim against the United States nor waives sovereign immunity, and none

of the other statutes or constitutional provisions cited by plaintiffs in the Amended Complaint --

including 42 U.S.C. §§ 1985 and 1988, or the First, Fourth, Fifth, or Fourteenth Amendments to

the Constitution -- establish such a waiver.  Because sovereign immunity therefore bars

plaintiffs' claims against the federal defendants, the Court should dismiss the Amended

Complaint as to them.  (See Point I, infra).

        In addition, plaintiffs lack standing to maintain their claims that the federal

defendants somehow unconstitutionally diluted their voting rights.  Among other reasons, the

federal defendants had no role in conducting the challenged election and plaintiffs cannot

establish with any mathematical certainty that their alleged injury -- Davis' election loss --

resulted from the FBI's execution of the search warrant and not from the myriad other factors

that may influence any particular voter's decision.  (See Point II(A), infra).  Similarly, plaintiffs

lack standing to maintain a Fourth Amendment claim, because the Amended Complaint does not

contain any allegation that any of the plaintiffs, including Davis, had any reasonable expectation

of privacy in the Mount Vernon City Hall files searched by the FBI pursuant to the Government's

carting contracts investigation.  (See Point II(B), infra).  Plaintiffs also fail to state a claim that

Davis was selectively prosecuted on the basis of his race in violation of equal protection

principles because, among other reasons, there is no allegation, let alone any evidence, that Davis

has been prosecuted, or that any non African-American official similarly situated to him was not

prosecuted.  (See Point II(C), infra).

In addition, to the extent that plaintiffs purport to sue the ten "John Doe" FBI agent defendants in their individual capacities for purported constitutional violations under Bivens v. Six Unknown Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), plaintiffs cannot maintain such claims.[1]  Indeed, because plaintiffs lack standing and/or fail to state a claim as to their vote dilution, Fourth Amendment and selective prosecution claims against the federal defendants, plaintiffs would not be able to maintain these same claims as Bivens claims against the John Doe FBI agents.  (See Point III, infra).

Plaintiffs also have recently filed a Second Amended Complaint, which contains the identical allegations as the Amended Complaint but purports to add Michael J. Garcia, the United States Attorney for this district, as a defendant.[2]  Plaintiffs' request, which they made without obtaining leave of Court or all defendants' consent in contravention of Fed. R. Civ. P. 15(a), should be denied as futile.  The Second Amended Complaint does not contain any specific allegations against Garcia, and, even if it did, principles of absolute immunity would bar any purported claims against him in his individual capacity arising from the performance of his prosecutorial duties associated with the judicial phase of the criminal process.  (See Point IV, infra).

Finally, although not addressed to the federal defendants, plaintiffs' request for a

_____

[1]  Plaintiffs have failed to serve the complaint on any of the John Doe FBI agents or identify them or their purported actions with sufficient specificity.  (See Declaration of Ross E. Morrison ("Morrison Decl."), Exh B (Amended Complaint) at ¶ 5).  As a result, the Department of Justice has not been able to approve representation for them at this time.

[2]  Because of plaintiff's improper filing, this Office does not represent Garcia in his individual capacity at this time.

new election should be denied. As Judge Castel of this Court has already held in denying

plaintiffs' request for a temporary restraining order, plaintiffs, who concededly were aware of

their purported claims following the October 12, 2007 FBI search, did not file this action until

after the Mount Vernon mayoral election, and cannot come close to establishing a likelihood of

success on the merits of their claims, all of which are meritless. (See Point V, infra). For all of

these reasons, the federal defendants' motion should be granted and the Amended Complaint

dismissed.

## BACKGROUND

A The Democratic Party Primary and the November 8, 2007 Election for the Office of
Mayor of the City of Mount Vernon, New York

  On September 19, 2007, Young, an African-American, defeated Davis, also an

African-American and the incumbent mayor of Mount Vernon, in the Democratic Party primary

to win the Democratic Party nomination for the upcoming election for the office of the mayor of

the city of Mount Vernon. (See Morrison Decl., Exh. E). On November 6, 2007, Young, as the

Democratic Party candidate, won that mayoral election. (Id., Exh. B at ¶ 8 ). Young defeated

Davis, who ran as an independent, as well as a number of other candidates, including plaintiff

Janet Snyder ("Snyder"), the Republican Party candidate. (Id., Exh. B at ¶ 9; Exh. E). Young

won the election by over 2600 votes, or over twenty percent of the approximately 11,500 votes

cast by Mount Vernon voters. (Id., Exh. E).

B. The Search Warrant for Documents Located at Mount Vernon City Hall and the Mount
Vernon Department of Public Works

  On October 12, 2007, pursuant to an ongoing criminal investigation, agents of the

FBI executed a search warrant at the offices of the Mount Vernon Department of Public Works,

-4-

and at Mount Vernon City Hall.  The search warrant sought documents concerning contracts between certain waste-hauling companies and the city of Mount Vernon.  (Id., Exh. B at ¶ 17; see also Exh. E (New York Times, Mount Vernon: F.B.I. Searches City Hall, Oct. 12, 2007 (reporting that the search warrant "specified boxes, drawers and binders holding documents relating to the Department of Public Works and two carting companies"))).[3]

C.    The Instant Action

_____On November 8, 2007, plaintiffs filed the Complaint in this action, and on November 12, 2007, an Amended Complaint.  (See Morrison Decl., Exh. A).  Besides the federal defendants, plaintiffs named as defendants the New York State and Westchester County Boards of Elections, Young, Snyder, and ten "John Doe" FBI agents.  (Id., Exh. B at ¶¶ 3-10).

In the Amended Complaint, plaintiffs identify themselves as "duly registered voters in the City of Mount Vernon . . . of African American or minority ancestry."[4]  (Id., Exh. B at ¶ 3).  The Amended Complaint alleges that on October 11, 2007, agents of the FBI, "under the

_____

[3]  Magistrate Judge Mark D. Fox of this Court signed the search warrant and, pursuant to Magistrate Judge Fox's Order, both the warrant and affidavit are currently filed under seal. Pursuant to the Court's Order at the January 11, 2008 pre-trial conference in this matter, the Government previously submitted copies of the search warrant and supporting affidavit to the Court for its in camera review.

[4]  At least three plaintiffs have withdrawn from the lawsuit.  (See Letter, dated January 6, 2008, from plaintiff Edna Bringer to the Court (stating that she "did not consent and/or agree to be included in this court action"); Letter dated Dec. 27, 2007, from plaintiffs Darryl Selsey and Elvira Castillo to the Court (asking that their names be removed from the action)).  In addition, according to newspaper articles, former Mayor Davis, as well as other plaintiffs, have disavowed any interest in the lawsuit. (See Morrison Decl., Exh. E (Desiree Grand, Davis Allies Seek to Block New Mayor in Mount Vernon, Journal News,  Dec. 3, 2007, at 1A ("Since the lawsuit was filed, City Clerk Lisa Copeland and some of the other listed plaintiffs have asked that their names be removed from the lawsuit. . . . Although he is listed as a plaintiff, Davis maintains he is not part of the complaint."))).

guise of investigating alleged improprieties in city trash-hauling contracts, engaged in a highly

publicized raid  of [Davis'] City Hall offices in Mount Vernon, New York," and that "defendants

knew that such action . . . would intimidate and dissuade voters from supporting the candidacy of

plaintiff Mayor."   (Id., Exh. B at ¶¶ 17-19).  The Amended Complaint further alleges that, in

executing the search warrant, defendants intended to "intimate [sic], suppress, negate, dilute and

otherwise unlawfully effect the right of franchise" of plaintiffs and other "African- American and

minority" voters , and that "the timing of . . .the raid . . . constituted prima facie evidence of

defendants' political and discriminatory motivation."[5]  (Id., Exh. B at ¶¶ 25, 30).

    Although plaintiffs do not allege that the execution of the search warrant

intimidated them or that they failed to vote in the November 6, 2007 election, the Amended

Complaint alleges that defendants' actions "actually caused the suppression of votes" in that

election.  (Id., Exh. B at ¶ 33).  The Amended Complaint also claims that the federal defendants

"have engaged in a pattern, custom and course of conduct that historically and disproportionately

targeted prominent African-American public officials . . . for removal from offices. . . specious

criminal investigations and/or unwarranted criminal prosecutions."  (Id., Exh. B at ¶ 27).  In

addition, plaintiffs claim that all defendants "conspired, colluded and schemed" to "unlawfully

intimidate potential voters and supporters" of Davis.  (Id., Exh. B at ¶ 14).

    The Amended Complaint claims that the defendants' actions violated various

---

[5]  Plaintiffs' counsel has subsequently stated that plaintiffs do not challenge the legitimacy of the Government's carting contracts investigation, and only challenge the timing of the execution of the search warrant.  (See Morrison Decl., Exh. E (Desiree Grand, Feds to Turn Over Material that Led to Mount Vernon Raid, The Journal News, Jan. 12, 2008 (quoting plaintiffs' counsel) ("I am not arguing if this was a valid search warrant and a valid investigation. The issue is the timing."))).

rights, including rights "guaranteed [by the] First, Fourth, Fifth and Fourteenth Amendments of the Untied States Constitution and the Voting Rights Act of 1965, [and] 42 U.S.C. sections 1983 and 1985" (Id., Exh. B at ¶ 38), and that these actions constituted "the intentional infliction of emotional distress" and "defamation of character, libel and slander of plaintiffs." (Id., Exh. B at ¶¶ 56, 59). As to the federal defendants, as well as the state and local defendants, the Amended Complaint seeks six hundred million dollars in damages. (Id., Exh. B at Wherefore Clause). As to the state and local defendants, the Amended Complaint seeks "an order . . . enjoining the installation of [Young] in the office of the City of Mount Vernon . . . and the scheduling of a new election . . . ." (Id.).

D.    Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction

On December 28, 2007, the last court business day of 2007, at approximately 4:30 p.m., plaintiffs sought a temporary restraining order ("TRO") and a preliminary injunction ("PI"), enjoining the inauguration of Mayor Davis. (Id., Exhs. C, D). In their application, plaintiffs clarified their claims, stating that the FBI's execution of the search warrant at Mount Vernon City Hall "diluted" their votes for Davis in the mayoral election, in that the search and attendant publicity allegedly caused "large numbers" of African-American voters in Mount Vernon who supported Davis not to vote for him, thereby causing him to lose the election. (Id., Exh. D at 2-6, 7). According to plaintiffs, this alleged vote dilution violated section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. (Id., Exh. D at 2).

In support of their application, plaintiffs submitted form affidavits from three alleged African American voters in Mount Vernon, none of whom are plaintiffs in this action. (Id., Exh. D). These affidavits, which are identical in form except for the handwritten names and

addresses of the three individuals, claim that the individuals "intended and desired to vote for"

Davis, but, because of the "extremely negative publicity and stigma associated with . . . the raid

and its closeness in time to the November 6, 2007 election" they were "intimidated from

participating in said election."[6]  (Id.).

Following a hearing, Judge Castel of this Court denied plaintiffs' request for a

TRO.[7]  Judge Castel held:

> Having reviewed the record, I find that the plaintiffs have not at this stage
> demonstrated a probability of success on the merits, or a likelihood of irreparable
> injury, nor have they shown any kind of balance of their hardships tipping
> decidedly in their favor or other grounds for injunctive relief.  It appears to this
> Court that the plaintiffs sat on their rights, to the extent they had any rights, took
> no action before the [election] results were certified  . . . .  There is a substantial
> public interest factor which weighs into my denial of a temporary restraining
> order.  The citizens and voters of the city of Mount Vernon went to the polls on
> November 6, they cast their ballots, and the results of the election has taken place.
> I cannot and will not lightly disregard the results of that election, particularly in
> the absence of any challenge, timely challenge to the certification of the results of
> that election.

(Morrison Decl., Exh. C at 20-23).

---

[6]  At the January 11, 2008 pretrial conference in this matter, plaintiffs' counsel referred to
a press release issued by the United State's Attorney's Office, which he claimed stated that the
Government's carting contracts investigation had allegedly began in May 2006.  However, that
press release, dated May 12, 2006, announced that the United States Attorney's Office "is
stepping up its efforts to investigate and prosecute public corruption in Westchester, Rockland,
Putnam, Duchess, Orange and Sullivan Counties," and does not refer to any specific
investigation.  (See Morrison Decl., Exh. D).

[7]  Judge Castel also questioned plaintiffs' counsel -- who appeared via telephone from his
car at the hearing -- about his attempts to notify the parties of plaintiffs' application for a TRO.
(Id., Exh. C at 2-11).  As to the federal defendants, plaintiffs' counsel had allegedly called the
United States Attorney's Office at 4:20 p.m. on the day of the hearing, and had allegedly tried to
reach some, but not all, of the other defendants by telephone.  (Id.).  The only defendants
represented at the hearing were the federal defendants, who also had not been served with
plaintiffs' TRO papers.

## ARGUMENT[8]

### POINT I

### SOVEREIGN IMMUNITY BARS ALL OF PLAINTIFFS' CLAIMS AGAINST THE FEDERAL DEFENDANTS

Because principles of sovereign immunity bar plaintiffs' claims against the federal defendants, subject matter jurisdiction does not exist over these claims. It is well-settled law that the "United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Mitchell, 445 U.S. 535, 538 (1980) (internal citation omitted). Sovereign immunity creates a jurisdictional bar to suit, see FDIC v. Meyer, 510 U.S. 471, 474-75 (1994), and "the existence of consent [to be sued] is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983); see also United States v. Testan, 424 U.S. 392, 399 (1976); Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994). Sovereign immunity applies not only to the United States per se, but also to "a federal agency or federal

---

[8] A motion to dismiss under Fed. R. Civ. P. 12(b)(1) or (6) should be granted if the complaint fails "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). While a complaint need not contain "detailed factual allegations," the factual allegations asserted "must be enough to raise a right to relief above the speculative level." Id. at 1964-65. The Second Circuit has interpreted Twombly to require a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original); see also Gamble v. City of New York, No. 06 Civ. 4849 (JSR), 2007 WL 2847221, at *3 (S.D.N.Y. Sept. 28, 2007) (same). Thus, "a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., -- F.3d --, 2007 WL 3071637, at *2 (2d Cir. Oct. 23, 2007). When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996).

officers [acting] in their official capacities," because an action against them is "essentially a suit against the United States." Robinson, 21 F.3d at 510.

Congress can waive the Government's sovereign immunity only through clear and unequivocal statutory language. See Lane v. Pena, 518 U.S. 187, 192 (1996); Testan, 424 U.S. at 399; see also Block v. North Dakota, 461 U.S. 273, 287 (1983) ( "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress."). Congress may also impose conditions on its waiver of the Government's sovereign immunity. United States v. Dalm, 494 U.S. 596, 608 (1990); United States v. Mottaz, 476 U.S. 834, 841 (1986). Waivers of sovereign immunity and their conditions must be strictly applied against the claimant. See Lane, 518 U.S. at 192; Millares Guiradesco de Tineo v. United States, 137 F.3d 715, 719 (2d Cir. 1998). If the Government has not waived its sovereign immunity, or if the conditions under which the Government has agreed to waive that immunity have not been met, federal subject matter jurisdiction does not exist. See United States v. Sherwood, 312 U.S. 584, 586 (1941); Williams v. United States, 947 F.2d 37, 39 (2d Cir. 1991).

Here, plaintiffs have not identified any waiver of sovereign immunity in any federal statute that would allow them to maintain their claims against the federal defendants. Plaintiffs purport to bring their claims under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. (See Morrison Decl., Exh. B at ¶ 1; Exh. D). That statute provides in relevant part:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection

(b) of this section.

42 U.S.C. § 1973(a) (emphasis added).  By its clear terms, this statute only applies to a "voting

qualification or prerequisite to voting or standard, practice or procedure" imposed or applied by a

"State or political subdivision," and does not apply to the federal government.  Moreover,

nothing in section 2 -- or anywhere else in the Voting Rights Act -- waives the Government's

sovereign immunity.  See Tucker v. U.S. Dep't of Commerce, 958 F.2d 1411, 1414 (7th Cir.

1992) ("The plaintiffs cannot be serious in arguing that the refusal [by federal officials] to adjust

the [census procedure] violates the Voting Rights Act.  That Act provides remedies only against

'any State or political subdivision' of a state."); Senate of State of Cal. v. Mosbacher, 968 F.2d

974, 979 (9th Cir. 1992) (argument that Voting Rights Act contemplates suits against the federal

government is "severely flawed"); City of New York v. U.S. Dep't of Commerce, 822 F. Supp.

906, 917 n.15 (E.D.N.Y. 1993) ("Plaintiff . . . claims that the [U.S. Department of Commerce

and its officials] . . . violated the Voting Rights Act . . . . The Court rejects this claim because it is

close to frivolous.  By its plain language, the Voting Rights Act applies only to misconduct by

states or their political subdivisions."), vacated on other grounds, 34 F.3d 1114 (2d Cir. 1994),

rev'd on other grounds, 517 U.S. 1 (1996).

Similarly, none of the other statutes cited in the Amended Complaint

(see Morrison Decl., Exh. B at ¶ 1), including 42 U.S.C. § 1983 -- which only applies to those

acting under color of state law and is inapplicable to federal officials acting under color of federal

law, see Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991) -- and 42 U.S.C. §§ 1985

and 1988, waive the Government's sovereign immunity.  See 42 U.S.C. §§ 1983, 1985 and 1988;

Harrison v. Potter, 323 F. Supp. 2d 593, 604 (S.D.N.Y. 2004) (dismissing claims brought against

-11-

Postal Service and Postmaster General under 42 U.S.C. §§ 1983 and 1985 on grounds that those statutes do not waive the Government's sovereign immunity); <u>Owens v. Suter</u>, No. 02 Civ. 8198 (SHS), 2003 WL 942554, at *2 (S.D.N.Y. March 7, 2003) ("There is no waiver of sovereign immunity for actions filed pursuant to . . . 42 U.S.C. § 1983 and other civil rights statutes.") (citations omitted); <u>see also</u> <u>Cuevas v. Dept. of Homeland Security</u>, 233 Fed. Appx. 642, 2007 WL 1423746 (9th Cir. May 14, 2007) (affirming dismissal of claims against the Government under 42 U.S.C. §§ 1983 and 1985 on grounds of sovereign immunity); <u>Saunders v. Reno</u>, No. 93-1829, 1993 WL 771009 (D.D.C. Dec. 20, 1993) ("42 U.S.C. § 1985 does not unequivocally express a waiver to sovereign immunity"); <u>Knights of the Klu Klux v. East Baton Rouge Parish School Bd.</u>, 679 F.2d 64, 66 (5th Cir. 1982) (holding that 42 U.S.C. § 1988, an attorney's fees statute, does not provide the clear or express language necessary to constitute a waiver of federal sovereign immunity).[9]

      Finally, none of the constitutional provisions cited in the Amended Complaint -- namely, the "First, Fourth, Fifth and Fourteenth Amendments" (Morrison Decl., Exh. B at ¶ 1) -- waive the Government's sovereign immunity. Indeed, constitutional claims for damages brought against the United States are "routinely dismissed for lack of subject matter jurisdiction" on the ground of sovereign immunity. <u>Keene Corp. v. United States</u>, 700 F.2d 836, 845 n.13 (2d Cir. 1983); <u>Adeleke v. United States</u>, 355 F.3d 144, 151-53 (2d Cir. 2004) (affirming dismissal of due

---

    [9]  In the Amended Complaint, plaintiffs purport to assert a defamation claim against the federal defendants. (<u>See</u> Morrison Decl., Exh. B at ¶ 59). The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680, provides a limited waiver of the Government's sovereign immunity for certain tort claims. <u>See</u> 28 U.S.C. § 1346(b). However, the FTCA does not waive the Government's sovereign immunity for intentional torts, including alleged defamation. <u>See</u> 28 U.S.C. § 2680(h).

process damages claim against the United States on the basis of sovereign immunity); <u>Robinson</u>, 21 F.3d at 510 (affirming dismissal of constitutional damages claims against federal employees in their official capacity on the basis of sovereign immunity); <u>see also</u> <u>King v. Simpson</u>, 189 F.3d 284, 287 (2d Cir. 1999) ("Congress has not waived the government's sovereign immunity, for example under the Federal Tort Claims Act . . . , from lawsuits based on constitutional claims.").

In sum, sovereign immunity bars plaintiffs' claims against the federal defendants. And for the same reasons, sovereign immunity also bars any claims against the John Doe FBI agent defendants in their official capacities because such claims are "essentially . . . against the United States." <u>Robinson</u>, 21 F.3d at 510. The Court should therefore grant the federal defendants' motion to dismiss the Amended Complaint.

**POINT II**

**PLAINTIFFS LACK STANDING TO ASSERT THEIR VOTE DILUTION AND WRONGFUL SEARCH CLAIMS, AND DO NOT STATE A SELECTIVE PROSECUTION CLAIM**

**A.     Plaintiff's Alleged Constitutional Vote Dilution Claims Should be Dismissed**

**1.     Plaintiffs' Vote Dilution Claims**

In addition to the bar of sovereign immunity, plaintiffs also cannot maintain their constitutional vote dilution claims against the federal defendants because they lack standing. As an initial matter, while "[t]he right to vote is regarded as 'a fundamental political right'" generally arising under constitutional due process protections, <u>Shannon v. Jacobowitz</u>, 394 F.3d 90, 93 (2d Cir. 2005) (quoting <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 370 (1886)), plaintiffs do <u>not</u> allege that they were denied the right to vote in the November 8, 2007 Mount Vernon mayoral election. Indeed, there is no allegation in the Amended Complaint that plaintiffs did not vote in

-13-

the election, or that they did not vote for Davis.[10]  Rather, as discussed above, plaintiffs' claim is

that their votes for Davis were "diluted," i.e., became less effective, because the FBI's search of

Mount Vernon City Hall allegedly caused other Mount Vernon voters not to vote for Davis, and

Davis consequently to lose the election.

Plaintiffs' claim of vote dilution does not track the legal framework established by

the Supreme Court and other courts for constitutional vote dilution claims.  Under that

framework, vote dilution claims typically involve mechanisms or structures created by state or

local authorities to "further racial discrimination by minimizing, canceling out or diluting the

voting strength of racial elements in the voting population," Rogers v. Lodge, 458 U.S. 613, 617

(1982) (quotation omitted), such as the creation of a voting district that is significantly more

populous than another district, or the use of at-large voting schemes.  Id.; see Wesberry v.

Sanders, 376 U.S. 1, 7-8 (1964) (striking down Georgia statute that had apportioned the state's

population into congressional districts in such a way that the plaintiff voters' district had two or

three times the population of other districts); see also Davis v. Bandemer, 478 U.S. 109 (1986);

_____

    [10]  Although the Amended Complaint does not appear to assert claims on behalf of other
Mount Vernon voters who allegedly were intimidated from voting for Davis, plaintiffs would not
have standing to assert such claims, which could be brought, if at all, only by those voters.  See,
e.g., Indiana Democratic Party v. Rokita, 458 F. Supp. 2d 775, 811-12 (S.D. Ind. 2006) (holding
that Democratic Party lacked standing to challenge photo identification requirement on behalf of
"voters not actually before the Court but who face insurmountable barriers in obtaining photo
identification prior to the election" because "such voters' injuries resulting from enforcement of
the [law] are sufficiently identifiable and concrete as to allow them to assert their own individual
claims as voters."); see also Boddie v. City of Cleveland, Miss., 297 F. Supp. 2d 901, 905-06
(N.D. Miss. 2004) (city lacked standing to assert claims that excluding local students in
apportioning the city's population into voting wards violated the student's equal protection
rights); see also Laird v. Tatum, 408 U.S. 1, 12-15 (1972) (holding that persons who were not
actually subjected to Army surveillance lacked standing to obtain injunctive or declaratory relief,
because any chilling effect they experienced resulted from mere knowledge of the surveillance).

Reynolds v. Sims, 377 U.S. 533 (1964).  Such mechanisms or structures may "dilute," or make

less meaningful, a vote cast in the more populous district, and violate the "one person one vote"

principle inherent in Article 1, § 2 of the Constitution, or constitutional equal protection

principles.  See Wesberry, 376 U.S. at 7-8.  Most significantly for the present case, vote dilution

claims typically "involve injuries that can be established with mathematical certainty," and

challenge "the governmental entity responsible for conducting the challenged election."

Kardules v. City of Columbus, 95 F.3d 1335, 1349 (6th Cir. 1996); see also Michel v. Anderson,

14 F.3d 623 (D.C. Cir. 1994) (finding a United States House of Representatives' rule which

granted delegates from federal territories and the District of Columbia the right to vote in the

House diluted the votes of voters who had elected State Representatives, because the voters "had

a right to elect a representative who cast one of 435 votes, whereas now their vote elects a

representative whose vote is only worth one in 440"); Albanese v. Federal Election Com'n, 884

F. Supp. 685, 692 (E.D.N.Y. 1995) (noting that vote dilution cases involve "the dilution of votes

based upon a measurable population disparity between districts, thereby diluting the 'value' of

the plaintiffs' votes with respect to their elected representative under a one person/one vote

formula").

### 2. Plaintiffs Lack Standing to Maintain Their Vote Dilution Claims

Given this legal framework for constitutional vote dilution claims, plaintiffs' lack

standing to maintain their vote dilution claim.[11]  The requirement of standing is derived from

---

[11]  Vote dilution claims arise under Article 1, § 2 of the Constitution, or constitutional
equal protection or due process principles that are applicable to the federal Government through
the Due Process clause of the Fifth Amendment to the Constitution.  See Wesberry, 376 U.S. at
7-8.  Although the Amended Complaint cites to the Fourteenth Amendment (see Morrison Decl.,
(continued...)

Article III of the United States Constitution, which limits judicial power to actual cases or controversies.  See Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 471 (1982); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976).  The essence of the standing inquiry is whether the plaintiffs have alleged a sufficient personal stake in the outcome of the controversy "to ensure the presence of 'that concrete adverseness which sharpens the presentation of the issues upon which the court so largely depends.'"  Lee v. Bd. of Governors of Federal Reserve Sys., 118 F.3d 905, 910 (2d Cir. 1997) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

To establish standing, plaintiffs must satisfy three conditions.  First, plaintiffs must have suffered some "distinct and palpable injury."  Matter of Appointment of Indep. Counsel, 766 F.2d 70, 73 (2d Cir.) (internal quotation marks and citation omitted), cert. denied,

---

[11](...continued)
Exh. B at ¶¶ 1, 38), that provision is plainly inapplicable to the federal defendants, because a violation of the Fourteenth Amendment requires state action.  See Jones v. Consumer Information Dispute Resolution, No. 06 Civ. 1809 (LAP), 2007 WL 2398811, at *5 (S.D.N.Y. Aug. 16, 2007).  Similarly, the Amended Complaint cites to the First Amendment (see Morrison Decl., Exh. B at ¶¶ 1, 12, 38, 44), which also is not a basis to assert a vote dilution claim.  The only First Amendment right potentially implicated by plaintiffs' allegations is the right of association.  See Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 214 (1986) ("The freedom of association protected by the First . . . Amendment[] includes partisan political organization."); see also Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 468 (2d Cir. 2006).  However, "interference with the act of voting, without more, [does not] constitute[] an infringement of the right of association. . . . [T]he act of voting may afford evidence of the type of relationship protected by the right of association, but . . . the act of voting alone, without more, cannot suffice to establish the kind of relationship protected under the First Amendment."  Willingham v. County of Albany, No. 04-CV-369 (DRH), 2006 WL 1979048, at *14 (N.D.N.Y. July 12, 2006).  Here, plaintiffs are not claiming that they were prevented from associating with Davis, only that their votes counted less because other voters were allegedly intimidated from voting for him, causing him to lose the election.  Plaintiffs' claim that their voting rights were impaired in this manner is insufficient to establish a violation of their right of political association under the First Amendment.  Id.

474 U.S. 1020 (1985); see also Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003); Lee, 118

F.3d at 910.  An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete

and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560 (1992) (internal citations omitted).  Second, the injury

must be "the result of the 'putatively illegal conduct of the defendant.'"  Indep. Counsel, 766

F.2d at 73 (quoting Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)).  In other

words, plaintiffs must show that the injury "fairly can be traced to the challenged action."

Simon, 426 U.S. at 41; see also Indep. Counsel, 766 F.2d at 73.  Third, it must be "likely that

plaintiff[s'] injury will be redressed by a favorable court decision."  Indep. Counsel, 766 F.2d at

74; see also Lee, 118 F.3d at 910.

   Here, plaintiffs can establish none of these factors.  Indeed, courts have

consistently rejected on standing grounds vote dilution claims which, as here, seek to challenge

the outcome of an election based on the actions of third parties without any role in conducting the

election.  In Kardules v. City of Columbus, 95 F.3d 1335, 1355 (6th Cir. 1996), for example, the

plaintiffs, residents of a village, claimed that a third party, the City of Columbus, had

unconstitutionally diluted the votes they had cast in a village vote on a proposed merger between

the village and a nearby township.  Specifically, the plaintiffs claimed that the City of Columbus,

by entering into contracts with the village which called for a ten-fold increase in the village's

utility rates if the residents of the village and township voted to merge, had intentionally and in

bad faith skewed the electoral process by providing an incentive "for a substantial number of

[village] voters to avoid the rate increase by voting against the merger" and thereby diluted the

votes that the plaintiffs had cast in favor of the merger.  Id. at 1348.

-17-

In construing the plaintiffs' vote dilution claim, the court first noted that vote dilution cases normally involve "injuries that can be established with mathematical certainty," such as where a state apportions its population into "congressional districts in such a way that the plaintiff voters' district had two to three times the population of some other districts."  Id. at 1349.  By contrast, the court found that the effect of the rate provisions on the village residents' voting was "not readily capable of proof."  Id. at 1350.  The court also noted that, unlike most vote dilution cases, the City, as an outside third party not responsible for conducting the merger vote, "is not in a position to directly distort the electoral process . . . in order to achieve the result" it allegedly desired.  Id. at 1350.  Based on these differences from typical vote dilution cases, the Kardules court held that the claimed vote dilution injury was "too conjectural, and too readily distinguishable from voting rights injuries recognized in case law to satisfy the 'injury in fact' element of . . . standing."  Id. at 1352.

The Kardules court also found that plaintiffs could not establish the causation and redressability elements of standing:

> Because many factors potentially entered into each individual voter's decision whether to support or oppose merger, and because each voter likely weighed those factors differently, [the plaintiffs] cannot show that the defeat of the merger proposal was attributable to the threat of a ten-fold [utility] rate increases.  Even if we were to deduce that the threatened rate increases probably had some influence on voter's decisions, we are unable to conclude that this influence was sufficient to alter the outcome of the merger election.  Finally, we think it inappropriate for courts to undertake the detailed inquiry into the electoral process that would be necessary to establish the causation element of [the plaintiffs'] claims.
>
> It follows that the redressability element of standing also is lacking; were we to strike the provisions in question from the water and sewage contracts, we are unconvinced that the fate of the merger proposal would be different.

Id. at 1355.

-18-

Similarly, in <u>Winpisinger v. Watson</u>, 628 F.2d 133, 139 (D.C. Cir. 1980), plaintiffs, voters in the Democratic Party presidential primary who had voted against the renomination of then-President Jimmy Carter, claimed that members of President Carter's administration had unlawfully used their public authority to help President Carter win the primary, thereby diluting the plaintiffs' votes.  The court found that the plaintiffs lacked standing:

> "The endless number of diverse factors potentially contributing to the outcome of state presidential primary elections . . . forecloses any reliable conclusion that voter support of a candidate is 'fairly traceable' to any particular event. . . . [A] court would have to accept a number of very speculative inferences and assumptions in any endeavor to connect [a plaintiff's] alleged injury with activities attributed to [the defendants].  Courts are powerless to confer standing when the causal link is too tenuous."

<u>Id.</u>; <u>see also</u> <u>Albanese</u>, 884 F. Supp. at 692.

Here, plaintiffs claim that a third party -- the federal defendants -- interfered with the Mount Vernon mayoral election by conducting a search at Mount Vernon City Hall three weeks before the election, thereby allegedly causing African-American voters not to vote for Davis and diluting the votes cast by plaintiffs for him.  However, the federal defendants, as the City of Columbus in <u>Kardules</u>, are an outside third party "not in a position to directly distort the electoral process . . . in order to" allegedly ensure Davis' loss, <u>Kardules</u> 95 F.3d at 1350, and, as with the effect of the threatened rate increase in <u>Kardules</u>, the effect of the FBI's search on the mayoral election is "not readily capable of proof."  <u>Id.</u>  Accordingly, plaintiffs' injuries are "too conjectural, and too readily distinguishable from voting rights injuries recognized in case law to satisfy the 'injury in fact' element of . . . standing." <u>Id.</u> at 1352.

Moreover, there is absolutely no way to establish that the FBI's search caused Mount Vernon voters not to vote for Davis in sufficient numbers to cause his loss in the election

-19-

and thereby allegedly dilute plaintiffs' votes for Davis. As there are an "endless number of

diverse factors potentially contributing to the outcome" of state elections, <u>Winpisinger</u>, 628 F.2d

at 139, it would be impossible to establish which and how many Mount Vernon voters allegedly

chose not to vote for Davis because of the FBI's search. Indeed, this is particularly true where

Davis lost the Democratic Party primary to Young in September 2007, <u>before</u> the FBI's search of

Mount Vernon City Hall, and subsequently lost the mayoral election by over 2600 votes.[12] And

for the same reasons, plaintiffs cannot establish that the result of the election would be any

different in the absence of the search. <u>See</u> <u>Kardules</u>, 95 F.3d at 1355. For all of these reasons,

plaintiffs lack standing to maintain their vote dilution claims.[13]

**B.    Plaintiffs' Alleged Fourth Amendment Claim Should be Dismissed**

In addition to the bar of sovereign immunity, plaintiffs' lack standing to maintain

their purported Fourth Amendment claim. Plaintiffs claim that the FBI search of Mount Vernon

City Hall constituted an illegal search and seizure under the Fourth Amendment. (<u>See</u> Morrison

---

[12] In addition, given Davis' overwhelming loss in the election, plaintiffs' submission in support of their TRO application of <u>three</u> form affidavits from Mount Vernon residents who allegedly were intimidated from voting for Davis (<u>see</u> Morrison Decl., Exh. D), only further demonstrates why plaintiffs cannot come close to demonstrating any of the required elements of standing.

[13] In addition, for the same reasons that plaintiffs lack standing to maintain a vote dilution claim, they also cannot state a cognizable dilution claim under the Constitution. As discussed above, plaintiffs' claim encompasses none of the typical elements of a vote dilution claim: plaintiffs' claim is based on the alleged actions of third parties -- the federal defendants -- without any control over Mount Vernon's electoral processes, and it is impossible to determine with any mathematical certainty the number of voters who allegedly did not vote for Davis because of the FBI's search. <u>See</u> <u>Kardules</u>, 95 F.3d at 1350. In addition, plaintiffs' claim that the FBI's search was intended to intimidate African-American voters from voting for Davis because of Davis's race, makes no sense because the winning candidate, Young, also is African-American. In such circumstances, plaintiffs fail to state a constitutional vote dilution claim.

Decl., Exh. B at ¶¶ 1, 38, 47).  To establish standing to challenge a search under the Fourth

Amendment, a plaintiff must have had a subjective "expectation of privacy" in the area searched,

and that subjective expectation must be reasonable.  Rakas v. Illinois, 439 U.S. 128, 143 (1978);

Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  "A defendant lacks

'standing' in the Fourth Amendment context when his contacts with the searched premises are so

attenuated that no expectation of privacy he has in those premises could ever be considered

reasonable."  United States v. Fields, 113 F.3d 313, 320 (2d Cir. 1997).  One important factor in

determining the reasonableness of a plaintiff's expectation of privacy is the extent of the

plaintiff's property or possessory interest in the place searched.  See United States v. Osorio, 949

F.2d 38, 40 (2d Cir.1991).  Although a person will often have a reasonable expectation of privacy

in his own office, see Mancusi v. DeForte, 392 U.S. 364, 369 (1968), this expectation of privacy

may be reduced for government employees working in public offices because "it is the nature of

government offices that others -- such as fellow employees, supervisors, consensual visitors, and

the general public -- may have frequent access to an individual's office."  O'Connor v. Ortega,

480 U.S. 709, 717 (1987); see id. at 718 ("Some government offices may be so open to fellow

employees or the public that no expectation of privacy is reasonable."); see also United States v.

Barrows, 481 F.3d 1246, 1248-49 (10th Cir. 2007) (holding that employee working in city hall

did not have reasonable expectation of privacy in his personal computer).

            Here, the Amended Complaint fails to allege any facts supporting the proposition

that Davis, or any of the other plaintiffs had a subjective expectation of privacy in the areas of

Mount Vernon City Hall that the FBI searched.  The Amended Complaint fails even to allege

what areas were searched or if Davis or any of the other plaintiffs had some possessory interest in

those areas.  Indeed, the only allegations in the Amended Complaint concerning the search -- that

the John Doe FBI agents "rifled through file cabinets and other receptacles" (see Morrison Decl.,

Exh. B at ¶ 18) -- fails to allege where those file cabinets were located, or whether plaintiffs had

any reasonable expectation of privacy in them.  Moreover, given that the search warrant sought

documents concerning contracts between Mount Vernon and certain waste-hauling companies --

documents that would not belong to any of the plaintiffs --  plaintiffs would not have any

reasonable expectation of privacy in those documents, or the file cabinets or boxes in which they

were located.  Plaintiffs' Fourth Amendment claim should therefore be dismissed.

## C.    Plaintiffs' Alleged Selective Prosecution Claim Should Be Dismissed

In addition to the bar of sovereign immunity, plaintiffs fail to state a selective

prosecution claim.  The Amended Complaint alleges that the search of Mount Vernon City Hall

"constituted selective prosecution and selective deprivation of the right of franchise." (Morrison

Decl., Exh. B at ¶ 29), in that the federal defendants "did not subject white public officials

seeking election" to actions like the FBI's search of Mount Vernon City Hall.  (Id., Exh. B at ¶

24).

In order to state a a claim of selective enforcement, which arises under the equal

protection guarantees of the Fifth Amendment, see Giordano v. City of New York, 274 F.3d 740,

750-51 (2d Cir. 2001), a plaintiff must allege that (1) the plaintiff was treated differently from

other similarly situated individuals, and (2) that such differential treatment was based on

impermissible considerations such as race, religion, intent to inhibit or punish the exercise of

constitutional rights, or malicious or bad faith intent to injure a person.  See Cobb v. Pozzi, 363

F.3d 89, 110 (2d Cir. 2004).  Thus, a "selective enforcement claim requires, as a threshold

matter, a showing that the plaintiff was treated differently compared to others similarly situated."

Church of the Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 209 (2d Cir. 2004)

(emphasis added); see United States v. Armstrong, 517 U.S. 456, 465 (1996); United States v.

Bass, 536 U.S. 862, 863-64 (2002).  The Second Circuit takes a stringent view of whether two

individuals are "similarly situated."  See Church of the Am. Knights, 356 F.3d at 210-11;

Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997) ("To be 'similarly

situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly

situated in all material respects.").

       Here, as an initial matter, plaintiffs (other than Davis) would not even have

standing to assert a selective prosecution claim.  As to Davis, the claim makes no sense; there is

no allegation or evidence, nor could there be, that the search warrant targeted Davis, or that he

has been prosecuted.  Indeed, the search warrant concerning carting contracts between Mount

Vernon and certain carting companies.  (See Morrison Decl., Exh. B at ¶ 17; Exh. E).  Moreover,

Young, the winning candidate in the Mount Vernon mayoral election, also is African-American,

and there is no allegation that he was treated differently because of his race.  Plaintiffs' claim

should therefore be rejected.

       In addition, plaintiffs' conclusory allegations cannot support a selective

prosecution claim.  Mere conclusory allegations are insufficient to state a claim of selective

prosecution.  See John Gil Const., Inc. v. Riverso, 99 F. Supp. 2d 345, 353 (S.D.N.Y. 2000)

("[P]laintiff's assertions of selective enforcement and racial animus are wholly conclusory and

unaccompanied by any supporting factual allegations.  Such vague and speculative statements are

insufficient to state a claim under . . . the Equal Protection Clause."); Dawson v. City of New

-23-

York, No. 97 Civ. 5347 (TPG), 2001 WL 527469, at *2 (S.D.N.Y. May 17, 2001) (dismissing

selective prosecution claim for failure to state a claim because complaint contained only

conclusory allegations); Weinstein v. Albright, No. 00CIV.1193 (JGK), 2000 WL 1154310, at *9

(S.D.N.Y. Aug. 14, 2000) (same).  Here, the Amended Complaint only makes conclusory

allegations of race-based selective prosecution without any supporting factual detail (see

Morrison Decl., Exh B at ¶¶ 24, 29), and the Court should accordingly dismiss this claim for

failure to state a claim.[14]

**POINT III**

**TO THE EXTENT PLAINTIFFS PURPORT TO SUE THE JOHN DOE
FBI AGENTS IN THEIR INDIVIDUAL CAPACITIES,
THE COURT SHOULD DISMISS THESE CLAIMS**

In the Amended Complaint, and in their TRO application (see Morrison Decl,

Exhs. B and D), plaintiffs do not make clear whether they intend to sue the ten "John Doe" FBI

agents in their individual capacities under Bivens v. Six Unknown Agents of Federal Bureau of

Narcotics, 403 U.S. 388 (1971).  In Bivens, 430 U.S. at 390–97, the Supreme Court found a right

of action to sue federal employees in their individual capacities for damages arising from alleged

violations of the Fourth Amendment.  See also Robinson, 21 F.3d at 510 (under Bivens, plaintiffs

may sue federal officials in their individual capacities for certain constitutional violations).

---

[14]  In addition, outside of the fact that sovereign immunity bars any claim against the
federal defendants based on alleged defamation, the Amended Complaint fails to state a
defamation claim.  The tort of defamation consists of a (i) a statement of fact, (ii) that is false,
(iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable
level of fault on the part of the speaker, (vi) either causing special harm or constituting slander
per se, and (vii) not protected by privilege.  See, e.g., Albert v. Loksen, 239 F.3d 256, 265-66 (2d
Cir. 2001).  The Amended Complaint contains no allegation that any of the federal defendants (or
anyone for that matter) made any statement at all, let alone one which meet the elements of a
defamation claim.

-24-

Although this Office does not represent the John Doe FBI agents, none of whom have been served, to the extent plaintiffs purport to bring such <u>Bivens</u> claims against these defendants, any such claims should be dismissed for the same reasons stated in Point II, <u>supra</u>: namely, plaintiffs' lack standing to maintain their vote dilution and Fourth Amendment claims, and fail to state a claim for selective prosecution.[15]

## POINT IV

### PLAINTIFFS' REQUEST TO FILE A SECOND AMENDED COMPLAINT SHOULD BE DENIED AS FUTILE

On February 5, 2008, plaintiffs filed a "Motion for Judgement," which appears to be copies of papers previously filed by plaintiffs on January 3, 2008, in support of their application for a TRO and PI, as well as a "Second Amended Complaint." (<u>See</u> Morrison Decl., Exhs. A, F). Because plaintiffs have already filed an Amended Complaint, and did not obtain either the consent of all defendants or leave of Court to file a Second Amended Complaint, the Second Amended Complaint is improper. <u>See</u> Fed. R. Civ. P. 15(a) (party may amend a pleading a second time "only with the opposing party's written consent or the court's leave").

---

[15] In addition, plaintiffs may not maintain any claims against the John Doe FBI agents under 42 U.S.C. § 1985, which makes it unlawful to conspire to interfere with civil rights. A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss. <u>See</u> <u>Leon v. Murphy</u>, 988 F.2d 303, 311 (2d Cir. 1993) (internal quotation marks omitted). Moreover, a plaintiff should make an effort to provide some details of time and place and the alleged effect of the conspiracy. <u>See</u> <u>Dwares v. City of New York</u>, 985 F.2d 94, 100 (2d Cir. 1993); <u>see also</u> <u>Ostrer v. Aronwald</u>, 567 F.2d 551, 553 (2d Cir. 1977) ("This court has repeatedly held that complaints containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed.") (internal quotation marks omitted). Here, the Amended Complaint fails sufficiently to allege a conspiracy, much less specify each defendants' purported role in any conspiracy. Indeed, the Amended Complaint merely claims that all "defendants conspired to . . . deprive[] plaintiffs of their right of franchise . . ." (Morrison Decl., Exh. B at ¶ 38), without adding a single factual detail about this purported conspiracy.

In any event, the Amended Complaint and Second Amended Complaint differ only in the addition of Michael J. Garcia, the United States Attorney for the Southern District of New York (who is incorrectly identified as the "United States Attorney for the Second Circuit"), as a defendant.  (<u>Compare</u> Morrison Decl., Exhs. B, F).  Although Garcia has not been served, and is not currently represented by the United States Attorney's Office in his personal capacity, any claims against him would be barred, and this Court should therefore deny as futile any request by plaintiffs to file a Second Amended Complaint.  <u>See, e.g.</u>, <u>Marchi v. Bd. of Cooperative Educ. Servs.</u>, 173 F.3d 469, 477-78 (2d Cir. 1999) ("Although leave to amend is usually freely granted, it may be denied within the trial court's discretion where the proposed amendment would be futile.").

As discussed above, <u>see</u> Point I, <u>supra</u>, any claims against Garcia in his official capacity are barred by sovereign immunity.  To the extent that plaintiff purports to bring <u>Bivens</u> claims against Garcia in his personal capacity, these claims should be dismissed for the same reasons that plaintiff cannot maintain any of his claims against the federal defendants, as set forth in Point II, <u>supra</u>.

In addition, the Second Amended Complaint fails to adequately allege the personal involvement of Garcia in any purported constitutional violation.  "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages'" under <u>Bivens</u>.  <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); <u>see also</u> <u>Barbera v. Smith</u>, 836 F.2d 96, 99 (2d Cir. 1987), <u>cert. denied sub nom.</u>, <u>Barbera v. Schlessinger</u>, 489 U.S. 1065 (1989).  Under <u>Bivens</u>, a plaintiff must allege that each individual defendant committed a specific wrongful act and was directly and personally

involved in the purportedly wrongful conduct.  See Barbera, 836 F.2d at 99; Mardsen v. Fed. Bureau of Prisons, 856 F. Supp. 832, 835 (S.D.N.Y. 1994).  Here, the Second Amended Complaint makes no specific allegations whatsoever concerning Garcia, and plaintiffs may therefore not maintain any Bivens claim against him.

Moreover, absolute immunity would bar any claims against Garcia in his personal capacity.  It is well-settled that prosecutors "are entitled to absolute immunity from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process."  Parkinson v. Cozzolino, 238 F.3d 145, 150 (2d Cir. 2001) (citations omitted).  The doctrine of absolute immunity rests on the concern that "the public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages."  Imbler v. Pachtman, 424 U.S. 409, 424-25 (1976).

The Supreme Court has "made clear that the proper analysis for determining whether particular actions of an official are absolutely immune . . . is the 'functional approach,' which looks solely to the nature of the function performed,"  Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993)); Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996).  As a general matter, therefore, acts "undertaken by a prosecutor . . . in the course of his role as an advocate for the state[] are entitled to the protections of absolute immunity."  Buckley, 509 U.S. at 273.  It is also clear that the "immunity attaches to the function the prosecutor is performing, not the way in which it is performed."  Hill v. City of New York, 45 F.3d 653, 662 (2d Cir. 1995). As a  result, that the alleged wrongful conduct is "not something that is properly within the role of a prosecutor is immaterial."  Dory v. Ryan, 25 F.3d 81, 83 (2d

-27-

Cir. 1994). Rather, the immunity protects prosecutors "for virtually all acts, regardless of motivation, associated with his function as an advocate," id., even improper ones. Thus, allegations that a particular act was "done in bad faith or with malice" does not "defeat[] a claim of absolute immunity." Dorman v. Higgins, 821 F.2d 133, 139 (2d Cir. 1987).

Here, although the Second Amended Complaint contains no specific allegations against Garcia, to the extent that plaintiffs are alleging that Garcia has some unspecified involvement in the search warrant executed at Mount Vernon City Hall, absolute immunity would bar such a claim. In Burns v. Reed, 500 U.S. 478 (1991), the Supreme Court squarely held that a prosecutor's "appearance in court in support of an application for a search warrant and the presentation of evidence at that hearing are protected by absolute immunity." Id., 500 U.S. at 492. In Burns, it was undisputed that the prosecutor had knowingly presented the judge with misleading police testimony. Id., 500 U.S. at 482-83. Nonetheless, the Supreme Court held that the prosecutor was entitled to absolute immunity because "the issuance of a search warrant is unquestionably a judicial act," and the prosecutor's appearance at the "probable-cause hearing is 'intimately associated with the judicial phase of the criminal process.'" Id., 500 U.S. at 492 (citation omitted). Thus, absolute immunity bars any purported claims against Garcia concerning the search warrant.

POINT V

THE COURT SHOULD DENY PLAINTIFF'S REQUEST
FOR A PRELIMINARY INJUNCTION

Although plaintiffs' request for injunctive relief -- specifically, their request that the Court set aside the results of the November 8, 2007 Mount Vernon mayoral election, and

order a new election -- is not addressed to the federal defendants, who had nothing to do with the

processes for local or state elections, plaintiffs' request and should be denied.  As an initial

matter, it is well-established that the doctrine of laches does not allow parties to bring untimely

claims seeking to set aside the results of an election:

> [I]n order to create an appropriate incentive for parties to bring challenges to state election procedures when the defects are most easily cured, we have held that "[t]he law imposes a duty on parties having grievances based on discriminatory practices to bring their complaints forward for preelection adjudication." Chinese for Affirmative Action v. Leguennec, 580 F.2d 1006, 1008 (9th Cir. 1978), cert. denied, 439 U.S. 1129 (1979). Although adequate explanation for failure to seek preelection relief has been held to exist where, for example, the party challenging the election had no opportunity to seek such relief, e.g. United States v. City of Cambridge, 799 F.2d 137, 141-42 (4th Cir. 1986), if aggrieved parties, without adequate explanation, do not come forward before the election, they will be barred from the equitable relief of overturning the results of the election.

Soules v. Kauaians for Nukolii Campaign Committee, 849 F.2d 1176, 1180-81 (9th Cir. 1988)

(emphasis added); see Hendon v. North Carolina State Bd. of Elections, 710 F.2d 177, 182 (4th

Cir. 1983) (noting that, as a "general rule" there is a "duty on parties having grievances based on

election laws to bring their complaints forward for pre-election adjudication"); see also Montana

Chamber of Commerce v. Argenbright, 226 F.3d 1049, 1058 (9th Cir. 2000) (upholding district

court's refusal to void election because "the voiding of a state election is a drastic if not

staggering remedy . . . [i]n determining whether to void an election, we balance the constitutional

violation against the countervailing equitable factors such as the extremely disruptive effect of

election invalidation and the havoc it wreaks upon local political continuity") (quotations and

citations omitted).

   Here, the FBI search of Mount Vernon City Hall occurred "on or about October

11, 2007, approximately three weeks prior to the November 6, 2007 general election"  (Morrison

Decl., Exh. B at ¶ 17), and plaintiffs therefore knew of their grievances well in advance of the election.  Indeed, contemporaneous news reports indicated that plaintiffs initially planned to seek pre-election adjudication of their grievances, but ultimately decided to wait until after the election to see if Davis would prevail.[16]   As Judge Castel of this Court has already held in this case, this is exactly what the law prohibits. (See Morrison Decl., Exh. C at 22 ("It appears to this Court that the plaintiffs sat on their rights, to the extent they had any rights . . ."); see United States v. City of Cambridge, Md., 799 F.2d 137, 141 (4th Cir. 1986) (a "candidate . . . should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see first whether [he] will be successful at the polls").

In addition, as Judge Castel previously held, plaintiffs do not come close to satisfying the standards for a preliminary injunction in this Circuit.    See, e.g., Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir.1997) (party seeking preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor).  Because, as discussed above, plaintiffs cannot succeed on the merits of their claims -- and have not shown any irreparable injury, nor any balance of hardships in their favor -- they are not entitled to any relief, let alone an order setting aside the wishes of the Mount Vernon electorate.  (See Morrison Decl., Exh. C at 22).  For all of these reasons, plaintiffs'

---

[16]   See Morrison Decl., Exh. E (No Court Action (Yet) in Mount Vernon Race, Politics on the Hudson,  Nov. 5, 2007 ("Civil rights attorney Stephen Jackson had said last week . . . that he planned to seek an injunction in federal court today to stop the election.  But Jackson did not file papers today as planned; . . . he said he was waiting until after the election to make his next move.")).

request for a PI should be denied.

## CONCLUSION

For the foregoing reasons, the federal defendants respectfully request that the

Court grant their motion to dismiss, together with such other and further relief as the Court

deems just and proper.

Dated: New York, New York
       February 22, 2008

                                   MICHAEL J. GARCIA
                                   United States Attorney for the
                                   Southern District of New York
                                   Attorney for the Federal Defendants

By:     /s/ Ross E. Morrison
                                   ROSS E. MORRISON
                                   Assistant United States Attorney
                                   86 Chambers Street -- 3rd Floor
                                   New York, New York 10007
                                   Telephone: (212) 637-2691
                                   Facsimile: (212) 637-2786
                                   E-mail: ross.morrison@usdoj.gov