**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF** _New York_

_Southern_

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/26/08

_Ernie Davis et al_

-v-

_U.S. Justice Department et al_

**NOTICE OF APPEAL**

07-9897 (CLB)

Docket No.

Notice is hereby given that _~~___~~ Plaintiffs_
(PARTY)

hereby appeals to the United States Court of Appeals for the Second Circuit from the

Decision (describe it) _dated May 27, 2008_
_dismissing the above captioned matter_
_for failure to state a cause of Action_

entered in this action on the _28_ day of _May_, 20_08_.

_[signature]_
Signature

Print Name _Stephen Jackson, Esq_
_350 Fifth Ave Ste 2310_
_New York, NY     10118_
Telephone No. (With Area Code)
_(212) 643-2394_

Date: _June 27, 2008_

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X
Ernest Davis, Lisa Copeland,
Raymond Copeland, Jr., Ray
Copeland, Sr., Kohain Natany A Halevi,
Thomas L. Terry, Oscar Davis, Jr.,
Marlene Pierot, Angelo Squitieri,
Maria Ellis, Davis Williams,

**07 CV 9897 (CLB)**
**JUDGMENT**

                    Plaintiffs,

          -against-
Michael J. Garcia, in his official
capacity United States Justice Department,
Federal Bureau of Investigation, United
States Attorney's Office, New York State
Board of Elections, Westchester County
Board of Elections, Clinton Young, Janet
Snyder, John Doe Federal Bureau of
Investigation Agents 1-10,



                    Defendants.
- - - - - - - - - - - - - - - - - - - X


        Defendants having moved to dismiss and the said motion having come before

the Honorable Charles L. Brieant, United States District Judge and the

Court thereafter on May 27, 2008, having handed down its, Memorandum and Order

(Document # 32) GRANTING defendants' motion to dismiss and DENIED Defendants'

motion for sanctions and DENIED Plaintiffs' motion for Preliminary Injunction,

it is,


        **ORDERED, ADJUDGED AND DECREED:** That the complaint be and

it is hereby dismissed as to all defendants.


DATED: White Plains, N.Y.
        May 28, 2008

                                J. Michael McMahon
                        J. Michael McMahon, Clerk

                                E.O.D.

i:/judgment/davis.897

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ERNEST DAVIS, LISA COPELAND,
RAYMOND COPELAND, JR., RAY
COPELAND, SR., KOHAIN NATANY A
HALEVI, THOMAS L. TERRY, OSCAR
DAVIS, JR., MARLENE PIEROT, ANGELO
SQUITIERI, MARIA ELLIS, DAVIS
WILLIAMS,

                            Plaintiffs,

                    - against -

MICHAEL J. GARCIA, in his official capacity
UNITED STATES JUSTICE DEPARTMENT,
FEDERAL BUREAU OF INVESTIGATION
UNITED STATES ATTORNEY'S OFFICE,
NEW YORK STATE BOARD OF ELECTIONS,
WESTCHESTER COUNTY BOARD OF
ELECTIONS, CLINTON YOUNG, JANET
SNYDER, JOHN DOE FEDERAL BUREAU
OF INVESTIGATION AGENTS 1-10,

                            Defendants.
------------------------------------------------------------x

07 Civ. 9897 (CLB)

*Memorandum and Order*

Brieant, J.

    Before the Court in this action, based on federal question jurisdiction, for violation of

election rights and vote dilution, is a motion for preliminary injunction pursuant to Fed. R. Civ.

Pro. 65, filed on February 5, 2008 (Doc. No. 11 ) and motions to dismiss the Second Amended

Complaint, pursuant to Fed. R. Civ. Pro. 12(b)(1) and (6), filed on February 26 and 27, 2008

(Doc. Nos. 13, 16).  Opposition papers were filed on April 15, 2008 (Doc. No. 24).  Reply papers

were filed on May 2 and 5, 2008 (Doc. Nos. 26, 29).  Oral argument was heard on May 9, 2008.

*Background*

The following facts are presumed true for the purposes of these motions only. Plaintiff Ernest D. Davis became involved in Mount Vernon politics in the mid-1970's at the encouragement of Reginald Lafayette, the Democratic Commissioner of the Westchester County Board of Elections, a municipal Defendant in this case. Mr. Davis served the City in several positions including Buildings and Assessment Commissioner and Chairman of the Planning and Real Estate Boards. He was one of the first African Americans elected to the Westchester County Board of Legislators, where he served six consecutive two year terms. He was elected as a "reform" Mayor of Mount Vernon on November 7, 1995, re-elected to a second term in November 1999 and a third in November 2003.

Some have referred to Defendant Clinton Young as Ernest Davis' political protégé. In 1995, Mr. Davis is said to have hand-picked Mr. Young to run for the seat that Mr. Davis vacated on the Westchester Board of Legislators in order to run for Mayor. In November 2007, Mr. Davis was on the ballot for reelection as Mayor. Defendant Young and Janet Snyder were also candidates for that office.

The City of Mount Vernon, cradled between the Bronx and Bronxville, has approximately 68,000 people residing in 4.4 square miles. One of the many cities, towns and villages that make up Westchester County, Mount Vernon has an African American voting majority, that is also predominantly Democratic. The City once suffered from a reputation as being a maladministered haven for drugs and crime. From the time he was first elected to public

office, Mr. Davis focused on economic and redevelopment strategies to revitalize the City.  His

goal was to transform Mount Vernon into a great place to do business.  Accomplishments over

the eleven years that Mr. Davis held office include the Sanford Boulevard retail development

center, which has generated increased employment and over $5 million in sales tax revenue; the

Third Street corridor revitalization project, involving new construction allowing businesses to

move into the street storefronts; the preservation of Levister Towers and the Hartley Park

renovation.  Also, as part of his greater vision for the redevelopment of the City, Mr. Davis, an

architect by profession, restored the traffic "circle" into the Roundabout; just one step in the

hopes of transforming the City into a lively destination for businesses, tourists and artists.

During his tenure as Mayor, Mr. Davis authorized the hiring of more City police officers.  In

November 2005, in response to the large Brazilian population now present in Mount Vernon, the

Mayor traveled to Pocos de Caldas, a blue-collar City in the mountains of southeast Brazil, to

sign a sister-city agreement to strengthen the bond between the two communities.  Between 2000

and 2006, the City of Mount Vernon's economy grew 20.5%, making it one of the fastest growing

cities in the metropolitan area of New York.


*Search of Mount Vernon City Hall and DPW*

On May 12, 2006, the United States Attorney's Office in this district issued a press

release announcing that the Office would begin "stepping up its efforts to investigate and

prosecute public corruption in Westchester, Rockland, Putnam, Dutchess, Orange and Sullivan

Counties."  The press release did not refer to any specific municipalities. However, pursuant to

ongoing criminal investigations, on October 12, 2007, immediately prior to the November

3

general election in Mount Vernon, agents of the FBI obtained and executed a federal search warrant at the offices of the Mount Vernon Department of Public Works ("DPW") and Mount Vernon City Hall. The search warrant sought documents related to contracts between the City of Mount Vernon and certain waste hauling companies. The search warrant, issued by a United States Magistrate Judge at White Plains, identified boxes, drawers and binders to be searched for such documents. An *in camera* review of the search warrant and the documentation on which it was issued, revealed that the search warrant was valid on its face and the search conducted was reasonable, and supported by probable cause. Enforcement of the warrant received significant press coverage. This Court has reviewed *in camera* proceedings in connection with the federal search warrant, dated October 9, 2007 and issued at 9:15 AM on that date, to search specific locations in the City of Mount Vernon therein described. These proceedings document existence of a scheme by private carters to defraud the City of at least one million dollars by overbilling for the removal and disposal of waste.

In March 2008, various waste haulers were indicted for federal charges relating to waste hauling contracts alleging that the City of Mount Vernon was criminally overcharged for waste hauling. On April 1, 2008, James Castaldo was arrested on charges that, while employed as a supervisor for the City of Mount Vernon DPW, he accepted bribes from waste haulers in return for allowing the haulers to overbill the City of Mount Vernon by at least $1.25 million for debris removed from a municipal storage yard. The investigation is currently on-going.

4

*2008 Primaries and November Election*

On September 19, 2007, Defendant Clinton Young defeated the incumbent Mayor Davis

in the Democratic Party primary by over 2,600 votes, winning the Democratic Party nomination

for the upcoming mayoral election. Davis decided to continue on in the race as the candidate of

the Independent and Conservative Party. Janet Snyder ran as the Republican Party candidate.

Mount Vernon has a high Democratic enrollment and as such, the winner of the Democratic

primary usually goes on to win the general election. The Mount Vernon mayoral election was

held on November 6, 2007, and approximately 11,500 votes were cast. Clinton Young, as the

Democratic Party candidate, won the election by over 2,600 votes, and has since taken office.


*The Instant Action*

Plaintiffs filed a Complaint in this case on November 8, 2007, and an Amended

Complaint on November 12, 2007. Plaintiffs, including former Mayor Ernest Davis, allege they

are duly registered "African American and minority" voters of the City of Mount Vernon. They

bring this action against Clinton Young and Janet Snyder as well as the United States Justice

Department (the "USDoJ"), the Federal Bureau of Investigations (the "FBI") and ten unnamed

FBI agents, Michael Garcia, the United States Attorney for the Southern District of New York, in

his official capacity, the United States Attorney's Office for the Southern District of New York

(the "USAO"), the New York State Board of Elections (the "NYSBE") and the Westchester

County Board of Elections (the "WCBE"). Plaintiffs allege violations of 42 U.S.C. §§ 1973,

1983, 1985, 1988, and the rights guaranteed by the First, Fourth, Fifth and Fourteenth

Amendments of the United States Constitution. In addition to the six million dollars in damages

asserted, Plaintiffs request injunctive remedies resulting in removal of Clinton Young, the current Mayor of Mount Vernon, from office and scheduling a new election. On February 5, 2008, Plaintiffs filed a "Motion for Judgment", which included a "Second Amended Complaint", which differs from the Amended Complaint only with respect to adding as a Defendant Michael J. Garcia, the United States Attorney for the Southern District of New York. Plaintiffs did not obtain consent or leave to file this Second Amended Complaint, however the Court will permit it to be filed and treat the motions to dismiss as directed against it.

The Second Amended Complaint alleges that Defendants violated Plaintiffs' right to franchise by purposefully scheduling a widely publicized, racially motivated raid on offices of the Administration of the City of Mount Vernon, at the time Mr. Davis was Mayor, and in close proximity to the November 6, 2007 general election, in violation of the Plaintiffs' rights and in contravention of the Defendant Departments' expressed policy against such action. Plaintiffs allege that all named Defendants conspired to do so, and such action was purposefully conducted in order to dilute the votes of the Davis supporters in the Mayoral Election and distort the outcome. Plaintiffs contend also that these actions were racially driven, in order to undermine the candidacy of Plaintiff Davis, as well as intimidate, suppress and dilute the right of franchise of Plaintiffs and similarly situated African American and minority voters in Mount Vernon, while white voters and candidates are not subjected to such tactics. Further, Plaintiffs allege that the actions of Defendants were intended to and did damage the reputation of the Plaintiffs and caused the actual suppression of votes in the November 6, 2007 general election.

6

Plaintiffs do not specifically allege violations of the Federal Torts Claim Act (the "FTCA"), however the Second Amended Complaint maintains that Defendants acted with intent to inflict emotional distress on Plaintiffs and also that Defendants actions constituted Defamation. Additionally, in their motion papers, Plaintiffs assert that Defendants' actions constituted an abuse of process, and request an opportunity to amend their pleading to reflect such a claim under the FTCA. This Court perceives no need for further amendment, and treats the pleadings as tendering all available theories.

*Application for TRO - Preliminary Injunction denied as moot.*

On December 28, 2007, the last business day of 2007, at approximately 4:30 pm, Plaintiffs sought a temporary restraining order ("TRO") and a preliminary injunction enjoining the inauguration of Mayor Young, set to take place four days later on January 1, 2008. Following a hearing, the Part I Judge of this Court denied Plaintiffs requests for a TRO. The Court held that Plaintiffs had failed to demonstrate a probability of success on the merits, a likelihood of irreparable injury, nor any showing of the balance of hardship tipping decidedly in their favor. There was also an issue as to whether adequate notice had been given to all affected parties. The Part I Judge concluded that, by failing to take any action prior to the election results being certified, Plaintiffs, to the extent that they had any, sat on their rights. "The citizens and voters of the City of Mount Vernon went to the polls on November 6, they cast their ballots, and the results of the election has [sic] taken place. I cannot and will not lightly disregard the results of that election, particularly in the absence of any [] timely challenge to the certification of the results of that election." (Morrison Decl., Exh. C at 20-23.) This Court agrees with that analysis

7

and for that reason alone preliminary injunctive relief of a sort which would materially alter the status quo pending trial should be and hereby is denied.


*Discussion of the Motion to Dismiss*

In deciding a motion to dismiss under Fed. R. Civ. Pro. § 12(b)(6), the Court must "accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). Additionally, in light of the recent Supreme Court decision in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007), in order to withstand dismissal, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. (this abrogates the rule of *Conley v. Gibson*, 355 U.S. 41, requiring "no set of facts" inquiry for motion to dismiss). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell*, 127 S.Ct. at 1965. Thus, the Plaintiff must allege some facts that support the elements of the claim alleged, in order to defeat the motion to dismiss.


*The Search Warrant*

This Court agrees that in order to challenge a search under the Fourth Amendment, a Plaintiff must have had a subjective expectation of privacy in the area searched and the vouchers

8

seized, and that subjective expectation must be reasonable. Here, Plaintiffs have no standing. The records and papers searched are required fiscal records of the City of Mount Vernon, open to the public for inspection as public records. They are not the personal papers of any defendant.

*Vote dilution*

All Plaintiffs did, in fact, vote in the general Mount Vernon mayoral election held on November 6, 2007, and their votes were counted. "[T]he essence of a § 2 vote dilution claim is that a certain electoral law, practice, or structure ... cause[s] an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives. *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003) (internal citations and quotations omitted). The effective exercise of electoral franchise depends on the ability of all voters, including the minority, to participate in the political process and elect their candidate of choice. Resolution of the question of vote dilution is a fact intensive enterprise to be undertaken by the Court. *Goosby v. Town of Hempstead*, 180 F.3d 476, 492 (2d Cir. 1999). Vote dilution claims usually take shape in a situation where there exists compact districts with sufficiently large minority populations who are unable, due to a voting practice, policy or procedure, to elect the candidate of their choice; more commonly known as "partisan gerrymandering." *Vieth v. Juberlirer*, 541 U.S. 267, 271 n.1 (2004). In such a circumstance, unlike in the instant case, injuries can usually be established with mathematical certainty.

The claim of vote dilution under the Voting Rights Act, and hence the coordinate right to an undiluted vote, or to cast a ballot equal among voters, belongs to individual persons and not to

a minority as a group. *Shaw v. Hunt*, 517 U.S. 899, 917 (1996). Plaintiffs argue that the effect of the raid was to dilute the vote of all minority voters. Specifically, to have a vote dilution claim, Plaintiffs must allege that their votes were rendered less effective due to the timing of the raid, and additionally, for liability to attach, Plaintiffs must show that the raid was intentionally designed to achieve such a result.

To establish standing, Plaintiffs must allege (1) "injury in fact", (2) a causal connection between the injury and the conduct complained of, which is "fairly traceable" and (3) it must be likely that the injury will be redressed by a favorable decision. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "Injury in fact" is an invasion of a legally protected interest which is (a) concrete and particularized (i.e. affects the plaintiff in a personal way) and (b) actual or imminent, not conjectural. *Id.*

"The endless number of diverse factors potentially contributing to the outcome of...elections...forecloses any reliable conclusion that voter support of a candidate is fairly traceable to any particular event." *Winpisinger v. Watson*, 628 F.2d 133, 139 (D.C. Cir. 1980). A court would have to accept a number of very speculative inferences and assumptions in any endeavor to connect Plaintiffs' alleged injury with activities attributed to the federal Defendants. Even if it were possible, we would be reluctant to probe the minds of the voters in an attempt to quantify the effects of these various factors. *Kardules v. City of Columbus*, 95 F.3d 1335, 1355 (6th Cir. 1996). Courts are powerless to confer standing when the causal link between the

10

alleged injury and the complained of conduct is too tenuous, namely, that Davis supporters, and only Davis supporters, decided to stay home and not vote when they heard about the raid on City Hall.

"The phrase vote dilution itself suggests a norm with respect to which the fact of dilution may be ascertained.... [I]n order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it should be for minority voters to elect their preferred candidates under an acceptable system." *Holder v. Hall*, 512 U.S. 874, 880 (1994) (citing *Thornburg v. Gingles*, 478 U.S. 30, 88 (1986)). In a City such as Mount Vernon, a predominantly Democratic City with a majority-minority population, the likelihood that the candidate who won the Democratic primary will go on to win the general election is great. Prior to the initiation of any investigation or even applying for a search warrant, the Democratic Primary was held and Clinton Young was victorious. Thus, in such a City, the opportunity of minority voters to elect their preferred candidate is substantial. In the context of this case, the Court may not lightly infer that Davis supporters heard about the last minute execution of the federal search warrant of the City offices, and as a result, lost confidence in his probity, and decided to stay home or vote for one of his opponents whom they would have presumably supported, notwithstanding the result of the primary election. That is what the Second Amended Complaint asks the Court to do.

*Claims as against the Federal Defendants*

*Subject matter jurisdiction - Rule 12(b)(1) and Sovereign Immunity*

11

Defendants USDoJ, FBI and USAO (collectively, the "Federal Defendants") submit that

Plaintiffs' claims against them must be dismissed pursuant to FRCP 12(b)(1) for lack of subject

matter jurisdiction, based on the doctrine of Sovereign Immunity. The doctrine of Sovereign

Immunity bars claims seeking monetary damages against the United States, its agencies, or

federal officers acting in their official capacity. Absent a waiver, sovereign immunity shields the

Federal Government and its agencies from suit. *Loeffler v. Frank*, 486 U.S. 549, 554 (1988). A

waiver of sovereign immunity "cannot be implied but must be unequivocally expressed" by

statute. *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (internal citations omitted) *United*

*States v. King*, 395 U.S. 1, 4 (1969). "In the absence of clear Congressional consent, then, there

is no jurisdiction in...any [] court to entertain suits against the United States." *Mitchell*, 445 U.S.

at 538.


Plaintiffs assert their claim of vote dilution under section 2 of the Voting Rights Act of

1965, 42 U.S.C. § 1973, which provides in relevant part:

> (a) No voting qualification or prerequisite to voting or standard, practice, or
> procedure shall be imposed or applied by any State or political subdivision in a
> manner which results in a denial or abridgement of the right of any citizen of the
> United States to vote on account of race or color, or in contravention of the
> guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection
> (b).

> (b) A violation of subsection (a) is established if, based on the totality of
> circumstances, it is shown that the political processes leading to nomination or
> election in the State or political subdivision are not equally open to participation
> by members of a class of citizens protected by subsection (a) in that its members
> have less opportunity than other members of the electorate to participate in the
> political process and to elect representatives of their choice. The extent to which
> members of a protected class have been elected to office in the State or political
> subdivision is one circumstance which may be considered: *Provided,* That nothing

in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

(42 U.S.C. 1973). By its terms, the statute applies only to "voting qualifications or standard, practice, or procedure...imposed or applied by any State or political subdivision" and does not apply to the Federal Government and its agencies. *City of New York v. U.S. Dep't of Commerce*, 822 F.Supp. 906, 917 n.15 (E.D.N.Y. 1993) ("By its plain language, the Voting Rights Act applies only to misconduct by states or their political subdivisions."), *vacated on other grounds*, 34 F.3d 1114 (2d. Cir. 1994), *rev'd on other grounds*, 517 U.S. 1 (1996).

Similarly, an action brought pursuant to §§ 1983, 1985 or 1988 of Title 42 cannot lie without the prerequisite of state action. *See* 42 U.S.C. §§ 1983, 1985, 1988. Clearly, these sections are inapplicable to this case of federal officials acting under color of federal law, nor do any of these provisions waive the Federal Defendants' sovereign immunity. *Graseck v. Mauceri*, 582 F.2d 203, 207 (2d Cir. 1978).

In their papers, Plaintiffs do not challenge the application of Sovereign Immunity to the Federal Defendants, but seek instead to restructure the damage allegations contained in the Second Amended Complaint as a *Bivens* claim. Soverign Immunity does not appear to prevent injunctive or declaratory relief, including an equitable decree for a new election. Clearly, the damages sought in these pleadings against the Government are barred. No basis appears for a new election to be declared, as noted earlier.

*Bivens claims against John Doe FBI officers*

_____The Supreme Court in *Bivens* held that a violation of the Fourth Amendment by a federal agent acting under color of state law can give rise to an action for damages based on such unconstitutional conduct. Courts have extended *Bivens* to the extent that plaintiffs may sue federal officials in their individual capacities for certain other constitutional violations, including violations of §1983. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994). As the identity of the John Doe FBI agents still remain unknown, they are not currently represented. However, the claims pleaded against such Defendants must be dismissed as the Plaintiffs have failed to state a claim for any Constitutional violation asserted in the Second Amended Complaint by the individual agents. Once identified, the agents will be entitled to immunity based on the good faith execution of a facially valid search warrant issued by a federal judicial officer. *See United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987); *United States v. Leon*, 468 U.S. 879 (1984).

_____

*Absolute Immunity of United States Attorney Michael Garcia*

_____The Second Amended Complaint adds as a Defendant Michael Garcia, in his official capacity as United States Attorney in this district. Mr. Garcia is entitled to absolute immunity from claims for damages arising out of prosecutorial duties that are intimately associated with the judicial phase of the criminal process, such as the investigations at issue in this case. *See Imbler v. Pachtman*, 424 U.S. 409, 430 (1976); *Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2d Cir. 2001).

14

*Timing of Federal Search of City Hall*

      Plaintiffs allege that the "timing" of the search of City Hall and the DPW, less than a

month before the mayoral election was violative of the Department of Justice published manual,

and is evidence of a political conspiracy formulated by all the Defendants in order to secure the

defeat of Mayor Davis.  These allegations are reminiscent of the famous Weinberger "arms-for-

hostages" affair.


      Casper W. Weinberger served in the cabinet of President Richard Nixon and as President

Ronald Reagan's Secretary of Defense, where he became a Presidential confidante and where he

acquired the nickname "Cap the Knife" for his efforts to slash government spending, largely by

cutting and curtailing many of former President Lyndon Johnson's Great Society social

programs.  On November 25, 1986, a major scandal exploded in Washington when President

Ronald Reagan told a packed White House news conference that funds derived from covert arms

deals with the Islamic Republic of Iran had been diverted to buy weapons to support the U.S.-

backed Contra forces in Nicaragua.  At the time, Congress had prohibited direct Government

assistance to the rebels.  It was revealed that administration officials had secretly arranged

weapon sales to Iran in exchange for the release of hostages; the proceeds of which were then

used to fund the anticommunist Contras in Nicaragua, a direct violation of a questionable budget

amendment known as the Boland Amendment. George H. W. Bush was then Vice-President.

Like President Reagan, Vice-President Bush stated that he had been "out of the loop" and was

unaware of the diversion of funds.  Public opinion polls taken at the time indicated that the

public entertained serious doubts as to the veracity of Vice-President Bush's explanation of being an "innocent bystander" while the arms transactions were occurring.

In June 1992, near the end of President Bush's four year administration and approximately four months prior to his running for reelection, Mr. Weinberger was indicted on five felony charges related to the Iran-Contra scandal, including accusations that he had lied to Congress and obstructed Government investigations by concealing over 1,700 pages of notes from his personal diary recording discussions with other officials about proposed arms sales to Iran. In September 1992, the charges against Weinberger were dismissed in Federal Court.

However, on October 30, 1992, just four days before the November 3, 1992 Presidential Election, Weinberger was indicted on new charges related to the Contras. The October 30 indictment also quoted a previously undisclosed entry in Mr. Weinberger's diary that sharply contradicted Mr. Bush's longstanding contention that he had not known about the secret sales of arms to Iran in order to secure the release of hostages in Lebanon until after it was publicly disclosed in 1986.

Coming on the Friday before an intense weekend of last-minute election campaigning, the second indictment was reported prominently on television and in newspaper reports. Mr. Bush was repeatedly asked about the issue and, in the bitter aftermath of his defeat, his supporters singled out the indictment as the event that damaged the President the most in the closing hours of the race. At his arraignment on November 25, 1992, the former Defense Secretary accused the

16

Iran-Contra prosecutors of using him as a political pawn by issuing the pre-Election Day

indictment against him that raised new questions about President Bush's role in the affair.

However, the lead prosecutor denied that the indictment was timed or worded to embarrass or

hurt Mr. Bush, stating "[t]his case has nothing to do with the politics and everything to do with

Government". Republicans on the Senate Judiciary Committee, angered by the timing of the

indictment, dismissed the explanations, and demanded that the Attorney General seek

appointment of an independent prosecutor to investigate whether the indictment was used for an

unlawful political purpose. The Attorney General rejected the request, but the United States

Attorneys Manual was amended to prevent election eve initiation of political cases._____


_____As to Plaintiffs' contention that the timing of the search in this case was in contravention

of the Federal Defendants' own policies growing out of the Weinberger experience, this Court

has held that the United States Attorneys Manual ("USAM") lacks the force of law. *United

States v. Shulman*, 466 F. Supp. 293, 298 (S.D.N.Y. 1979), *aff'd* 624 F.2d 384 (2d Cir. 1980).

Title 1 § 1-1.100 of the USMA clearly contains the following relevant provisions:

> 1-1.100 PURPOSE OF THE MANUAL
>
> ...This Manual provides only internal Department of Justice guidance. It is not
> intended to, does not, and may not be relied on to create any rights, substantive or
> procedural, enforceable at law by any party in any matter civil or criminal. Nor
> are any limitations hereby placed on otherwise lawful litigative prerogatives of the
> Department of Justice.


While Plaintiffs' claim in this litigation that the voters of Mount Vernon lost faith in Mr.

Davis, refusing to re-elect him after many years of devoted service, due in part to unfair timing of

the search is insufficient to state a claim, certainly in light of the Weinberger experience, the allegations are not frivolous and could well be a matter of concern. _____

*Plaintiffs' Claims of Selective Prosecution*

In their Second Amended complaint, Plaintiffs assert that the search constituted selective prosecution and selective deprivation of the right of franchise. Specifically, Plaintiffs allege that the search was conducted in order to dissuade minority voters from casting their vote for their desired Mayoral candidate. Additionally, Plaintiffs maintain that similar action was not taken against white public officials.

In order to state a claim of selective prosecution, Plaintiffs must allege that (1) they were treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004).

As a political figure, Mr. Davis cannot maintain such an action. There is no evidence in support of the allegation that Mr. Davis was treated differently by the Defendants than the winning candidate in the Mount Vernon race, based on race, as claimed. Mr. Young and Mr. Davis are both African-American. Additionally, Plaintiffs, as voters, cannot maintain an action for selective enforcement as there is no evidence that the search was directed against them.

18

*Abuse of Process - §1983*

In their opposition papers, Plaintiffs now assert that their claim under §1983 is for abuse of process. This Circuit has held that a civil rights claim cannot be predicated on malicious abuse of civil process. *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992). Accordingly, on this point, the Second Amended Complaint fails to state such a claim. *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).

*Claims against NYS and Westchester County Board of Elections as conspirators*

_____There is no evidence or allegation that the New York State Board of Elections or Westchester County Board of Elections were involved in the decision to investigate the hauling contracts or its timing, nor any allegation that these entities participated in anyway in the on-going investigation.

*Claims against the Private Individual Defendants - Young and Snyder*

_____In order to allege a conspiracy between the private individuals and government actors, Plaintiffs must show the existence of a meeting of the minds, and the intention knowingly to deprive an individual of his constitutional rights. *See Annunziato v. The Gan, Inc.*, 744 F.2d 244, 251 (2d Cir. 1984). The Second Amended Complaint fails to state such a claim. Moreover, as to the Federal Defendants, it is clear that the statutory sections relied on apply to "state action", and not federal.

19

*Federal Torts Claim Act and Claims for Injury to reputation, intentional infliction of emotional distress, defamation (libel and slander)*

_____It is well established that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued," and hence may be sued only to the extent that it has waived sovereign immunity by enacting a statute consenting to suit. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The FTCA, 28 U.S.C. §§ 1346(b), 2401(b) and 2671-2680 constitutes a limited waiver by the United States of its sovereign immunity, and thus, the exclusive remedy for any tort claims against the United States falls within the Act. *See Dalehite v. United States*, 346 U.S. 15, 30-36 (1953). "[T]he terms of [the government's] consent to be sued in any court define that court's jurisdiction to entertain the suit." *Sherwood*, 346 U.S. at 586. Any limitations imposed by the waiver statute, whether they be substantive, procedural, or temporal, are to be strictly applied against the claimant. *See, e.g., Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998). The FTCA's limitations foreclose suit unless the tort claimant has previously presented to the appropriate administrative agency a claim that meets the specific statutory requirements as to its form, content, and timing.

In order to maintain a claim under the FTCA, Plaintiffs were required to exhaust all administrative remedies before filing a complaint in Federal District Court. *See* 28 U.S.C. 2675(a). All records of administrative claims submitted to the FBI under the FTCA are indexed into the FBI's Central Records System. No record of any administrative claim submitted to the FBI by any of the named Plaintiffs in this action exists. Additionally, the exception relied on by

20

Plaintiffs, stated in 28 U.S.C. § 2680(h), is of no effect because, as stated *supra*, the Plaintiffs cannot maintain a claim under §1983 for abuse of process in this case.

*Sanctions*

_____Although the claims asserted by Plaintiffs cannot be maintained on the pleadings, the claims are not found to be frivolous and sanctions are not ordered against the Plaintiffs in light of the important public interest in protecting the franchise. *See Fed. R. Civ. Pro 11(b)* (sanctions are authorized only when a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation", or when based on frivolous arguments).

*Conclusion*

_____Plaintiffs' motion for Preliminary Injunction is DENIED.  Defendants' motions to dismiss are GRANTED.  Defendants' motion for sanctions is DENIED.  The Clerk shall file a final judgment dismissing the action.

X

                    X

                              X

                                        X

21

SO ORDERED.

Dated: White Plains, New York
      May 27, 2008

                                          Charles L. Brieant, U.S.D.J.